IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEVEN STARCHER,<br>　　　　　Plaintiff | )<br>)<br>) | C.A. No. 16-314 Erie |
| v. | )<br>) | |
| AMERIDRIVES INTERNATIONAL,<br>et al.,<br>　　　　　Defendants. | )<br>)<br>)<br>) | District Judge Susan Paradise Baxter |

**MEMORANDUM OPINION**

**I.　INTRODUCTION**

**A.　Relevant Procedural History**

Plaintiff Steven Starcher brings this action pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"), and the Family Medical Leave Act, 29 U.S.C. § 2615(a) ("FMLA"), against Defendants Ameridrives International ("Ameridrives" or "the Company"); The United Steel, Paper and Forestry, Rubber, Manufacturing Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC ("International Union"); and The United Steel, Paper and Forestry, Rubber, Manufacturing Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC Local 3199-10 ("Local Union").

The operative complaint [ECF No. 69, Amended Complaint] contains three counts: (I) a claim against both Defendants International Union and Local Union, under Section 301 of the LMRA, for breach of their respective duty of fair representation; (II) a claim against Defendant Ameridrives, under Section 301 of the LMRA, for breach of the terms of its collective bargaining agreement ("CBA") with the Defendant Unions; and (III) a claim against Defendant Ameridrives for terminating Plaintiff in violation of the FMLA. As relief for his claims, Plaintiff seeks declaratory relief and monetary damages.

1

The parties have completed discovery and now pending before the Court are the following: Defendant Local Union's motion for summary judgment [ECF No. 76]; Defendant International Union's motion for summary judgment [ECF No. 77]; and Defendant Ameridrives' motion for partial summary judgment as to Count II, only [ECF No. 81]. Plaintiff has filed a brief in opposition to each of Defendants' motions [ECF Nos. 89, 94], Defendants have filed reply briefs [ECF Nos. 101, 103, 106], and Plaintiff has filed a sur-reply brief to Defendant Ameridrives' reply [ECF No. 111]. Also pending before the Court is Defendant Unions' joint motion to strike Plaintiff's "sham affidavit" [ECF No. 102],[1] to which Plaintiff has filed a response [ECF No.109]. This matter is now ripe for consideration.

**B.    Relevant Undisputed Material Facts[2]**

Plaintiff was a member of both the Local Union and the International Union throughout his employment with Ameridrives. (Id. at ¶ 2; ECF No. 80, at ¶ 3). The Defendant Unions and Ameridrives were parties to a Collective Bargaining Agreement ("CBA") that governed the terms and conditions of employment for bargaining unit employees. (ECF No. 80, at ¶ 11; ECF No. 84-8). Under the CBA, Ameridrives had the right to suspend or discharge employees for proper cause. (ECF No. 80, at ¶ 12). The CBA also established a grievance and arbitration procedure for disputes concerning the interpretation and application of the CBA. (Id. at ¶ 13). In addition, during his employment with Ameridrives, Plaintiff was subject to Ameridrives' Work Rules/Code of Conduct, which, *inter alia*, (and as relevant here) made it a serious offense to remove company property without authorization. (ECF No. 83, at ¶¶ 8-9).

---

[1] The affidavit at issue is attached as Exhibit "O" to Plaintiff's responses to Union material facts [ECF No. 95-5].

[2] The factual recitation contained herein is gleaned from Defendants' statements of undisputed material facts [ECF Nos. 80, 83] and Plaintiff's counter statements of material facts [ECF Nos. 90, 93], to the extent the facts are either admitted by the parties or fully supported by the record evidence. In addition, only those facts related to Plaintiff's LMRA claims are presented here, as Plaintiff's FMLA claim against Defendant Ameridrives is not at issue.

Plaintiff began his employment with Defendant Ameridrives in March 2013 as a maintenance electrician at its facility in Erie, Pennsylvania. (ECF No. 83, at ¶ 1). Ameridrives' manufacturing process includes an electronic discharge machine ("EDM"), which produces scrap brass wire ("EDM scrap") that was collected in barrels inside the facility to be transported to a scrap facility. (ECF No. 80, at ¶ 47). When Plaintiff began his employment with Ameridrives, he replaced Ernie Robinson ("Robinson"), who had regularly engaged in the practice of transporting and selling the EDM wire scrap to a scrap dealer, and delivering the sale proceeds to the plant manager at the time, Ken Gebhardt ("Gebhardt"). (ECF No. 90, at ¶¶ 67-75).[3] When Gebhardt retired, his replacement, Steven Sanders ("Sanders") instructed Robinson to continue the practice. (Id. at ¶¶ 79-80).

After Plaintiff was hired, Robinson told him about the EDM wire scrapping practice and demonstrated how it worked. (Id. at ¶¶ 83-86). Thereafter, at Sanders' direction, Plaintiff continued the practice of selling the EDM wire scrap to a scrap dealer. (ECF No. 80, at ¶¶ 48-49; ECF No. 83, at ¶ 43-44). A typical load of scrap consisted of approximately three or four barrels, weighing about 80 pounds each, which were loaded onto Plaintiff's personal vehicle with the Company's fork truck. (ECF No. 80, at ¶¶ 50-51). Plaintiff then transported and sold the scrap to Lincoln Recycling at its facility in Meadville, Pennsylvania, near Plaintiff's home. (Id. at ¶ 52; ECF No. 83, at ¶ 36). Plaintiff was not paid an hourly wage by the Company for recycling the EDM wire scrap. (ECF No. 80, at ¶ 57).

In April 2016, Company supervisor Jon Muroski ("Muroski") loaded EDM wire scrap on his truck to take to a local scrapyard, but Sanders asked Muroski to remove the barrels of scrap

---

[3] According to Robinson, the proceeds were paid by check directly to him, and he then cashed each check and delivered the cash and receipts to Gebhardt. (Id. at ¶ 75).

from his truck so that Plaintiff could come in and transport the scrap to the scrapyard. (Id. at ¶ 66). Ameridrives' General Manager, Jack Paluh ("Paluh") later learned that Plaintiff was present at the Erie facility to take EDM wire scrap to be recycled while he was on FMLA leave. (ECF No. 104, at ¶ 22). This prompted Ameridrives to investigate the circumstances regarding the recycling of EDM wire scrap. (Id. at ¶ 23).

On May 10, 2016, Robert Finzel ("Finzel"), Ameridrives' Operations Manager, and Amy Popoff ("Popoff"), Ameridrives' Division HR Manager, spoke with Sanders regarding his understanding of the EDM wire scrap process. (ECF No. 83, at ¶ 32). During the meeting, Sanders stated that he was aware of the practice, but falsely stated that he didn't ask Plaintiff to do so, except on one occasion (ECF No. 90, at ¶¶ 96, 98). Sanders also claimed that he was "never given any check or money from [Plaintiff]... [and] has no idea where it might be going." (ECF No. 90, at ¶ 97; ECF No. 83, at ¶ 33).

On the same date, Finzel and Popoff also had a meeting with Plaintiff about the EDM wire scrap process, at which Plaintiff refused union representation. (ECF No. 83, at ¶¶ 34-35). During this meeting, Plaintiff stated that he had been recycling the EDM wire scrap for "a couple of years, always at [Sanders'] request." [ECF No. 80-24]. Plaintiff explained that the sale proceeds were paid by check to Plaintiff's personal business, Crawford County Diversified Services, LLC ("CCDS"), because, according to Plaintiff, he could receive an extra $.10 per $1.00 for the scrap by having it paid to a business, rather than an individual. (ECF No. 80, at ¶ 55; ECF No. 83, at ¶¶ 37-38). According to Plaintiff, he then gave the proceeds, in cash, along with the receipt from the scrap yard, to Sanders. (ECF No. 83, at ¶ 41; ECF No. 90, at ¶ 111). Plaintiff estimated that the proceeds were $500 to $600 each time, and stated that he understood the money would be used for shop items. (ECF No. 90, at ¶¶ 111-112; ECF No. 80, at ¶ 69).

4

Plaintiff claimed that the only personal benefit he received from the practice was occasional gas money from Sanders. (ECF No. 93, at ¶ 58; ECF No. 80-24).

On May 13, 2016, Plaintiff produced Purchase History Registers from Lincoln Recycling ("Lincoln"), confirming that EDM wire scrap was recycled by CCDS. (Id. at ¶ 48). The register reflected sales by CCDS to Lincoln of a total of 6,792 pounds of EDM wire scrap, on 23 different dates from November 5, 2013, through April 14, 2016, with payments totaling $10,380.20. (ECF No. 80, at ¶ 73). No records reflecting the receipt or disbursement of any funds from the sales were produced (Id. at ¶¶ 60-61), and no proceeds from the EDM wire scrapping process were ever recovered by the Company (ECF No. 83, at ¶ 52).

On May 16, 2016, Finzel, Popoff, and Aimee Jones ("Jones"), the Company's Human Resources Generalist, met with Plaintiff and three Local Union officers who were members of the Local Union's grievance committee: Jim Fisher ("Fisher"), President; Jack King ("King"), Recording Secretary; and Billy Moore ("Moore"), Chief Griever. (ECF No. 83, at ¶ 50; ECF No. 93, at ¶¶ 6-8). Prior to the meeting, King informed Plaintiff that the union would be at the meeting to represent him and save his job. (ECF No. 81, at ¶ 51). However, it was common knowledge that Plaintiff and King were not friendly, and that King had previously reported Plaintiff to management for purported work violations on a number of occasions. (ECF No. 93, at ¶¶ 128-137, 144).

At the meeting of May 16, King reported that he had seen Plaintiff on a jitney one night and reported it to a supervisor, who made Plaintiff stop operating it immediately. (Id. at ¶ 159). King also questioned Plaintiff's assertion that he had been instructed to pick up EDM wire scrap, asking "why would they call you to come all the way to Erie?" (Id. at ¶ 160). In addition, Fisher asked why an hourly employee would be asked to take the EDM wire scrap to the recycling

5

company and questioned if Plaintiff would be entitled to workers' compensation if he got hurt while coming in for the EDM wire scrap. (Id. at ¶¶ 161-162). Fisher also mentioned that, though he had heard about a shop fund, and thought there was one, he didn't have first-hand knowledge of a fund's existence. (ECF No. 80, at ¶ 92). At some point, Finzel reached the conclusion that Sanders and Plaintiff had colluded with respect to the EDM wire scrap. (Id. at ¶ 90). The Company contacted the local police department to initiate a criminal investigation into the EDM wire scrapping process. (Id. at ¶ 93).

The Company ultimately terminated Plaintiff's employment as of May 19, 2016, by letter from Jones, dated May 20, 2016 [ECF No. 80-30]. The letter did not specify a reason for the termination. (Id.). Sanders was also fired as of the same day, in the same manner. [ECF No. 80-31]. On May 24, 2016, the Local Union filed a grievance noting the reason for Plaintiff's termination as "code of business conduct violation (theft)," and challenging the action as an "unjust termination." [ECF No. 80-32].

On May 31, 2016, International Union Staff Representative Edward Kemick ("Kemick") met with Plaintiff, King, Fisher, and Moore to discuss the grievance. (ECF No. 80, at ¶¶ 101). As Staff Representative, Kemick was responsible for handling the grievance and was the only person empowered to determine whether to arbitrate the grievance. (Id. at ¶¶ 15-16). Though Kemick had not met Plaintiff previously, he learned about the lack of goodwill between Plaintiff and King in connection with his review of the grievance, but did not know the reason(s) why they were not friendly. (ECF No. 93, at ¶¶ 141-42). As the recording secretary, King was responsible for taking notes on behalf of the Local Union during meetings with the Company, and he also served as Kemick's "point person" for receiving information about Plaintiff's grievance. (Id. at ¶¶ 149-150).

Later on May 31, Kemick, Plaintiff, Fisher, King, and Moore, met with Popoff, Finzel, Paluh, and Jones from the Company. (ECF No. 80, at ¶ 103). At the meeting, Kemick pointed out to the Company that Plaintiff's termination letter did not give a reason for the termination, and he asked Popoff to provide the Company's position. (Id. at ¶ 104). Popoff replied that Plaintiff was fired "because of the theft of the scrap EDM wire and the Company was never aware of the so-called slush fund." (ECF No. 90, at ¶ 59). At the end of the hearing, Kemick asked the Company to reinstate Plaintiff. (ECF No. 80, at ¶ 107). The Company subsequently denied the grievance on June 6, 2016. (Id. at ¶ 108).

At some point, Plaintiff told Kemick that the EDM wire scrapping practice was handed down to him by Robinson, and that Robinson told him that one of his duties was to recycle the EDM wire scrap and give the money to Sanders. (Id. at ¶ 111). Kemick also understood that Plaintiff believed he was permitted to take the scrap, that he had been directed to do so by Sanders, and that what he was doing was appropriate. (Id. at ¶ 109). Nonetheless, Kemick reached the conclusion that the evidence showed that Plaintiff was aware that what he was doing was improper, that Plaintiff's account of the facts did not make sense, that the circumstances did not pass the "smell test," and that he could not convince an arbitrator to grant the grievance. (Id. at ¶ 117).

On June 14, 2016, Kemick proposed to Popoff that the grievance over Plaintiff's discharge be held in abeyance pending the resolution of the police investigation into the EDM wire sales. He proposed that if Plaintiff was found innocent, he be returned to work and made whole by the Company, and that if Plaintiff was arrested, the grievance would be withdrawn. (Id. at ¶ 118). Kemick admitted that this was a "shot in the dark" attempt to save Plaintiff's job. (Id. at ¶ 119). The Company rejected Kemick's proposal by letter dated June 15. (Id. at ¶ 120). On

7

June 28, Plaintiff's attorney wrote a letter to Kemick and the International Union's District Director asking that the arbitration not be delayed because of the police investigation, because the results "are never disclosed to outsiders." (Id. at ¶ 121).

Kemick consulted with the Local Union when he was deliberating on whether or not to withdraw Plaintiff's grievance, and he generally "[took] their opinion into account." (ECF No. 93, at ¶¶ 151-152). The only documents he requested in connection with the grievance were the records from the scrapyard. (Id. at ¶ 264). Kemick made no effort to probe into the Company's assertion that no one ever received cash for tools, nor did he attempt to speak to Gebhardt, Sanders, or Robinson, all of whom knew of the EDM recycling practice. (Id. at ¶¶ 265-266, 269). He also made no effort to contact the Millcreek Police Department about its investigation. (Id. at ¶ 270). Ultimately, by letter dated June 30, Kemick notified the Company that he was withdrawing the grievance and, by separate letter, advised Plaintiff that the grievance had been withdrawn. (ECF No. 80, at ¶¶ 122-123). Kemick had never arbitrated any grievances at the Company's facility and had never appealed to arbitration a grievance regarding termination of an employee at the Company. (Id., at ¶¶ 21-22).

## II. DISCUSSION

### A. Section 301 of the LMRA Standard

A suit under Section 301 of the LMRA is a hybrid action comprising two distinct causes of action: one against the contracting union to the CBA and one against the employer. See 29 U.S.C. § 185; DelCostello v. Int'l Brotherhood of Teamsters, 462 U.S. 151, 164-165 (1983); The claim against the union is for "breach of the union's duty of fair representation, which is implied under the scheme of the National Labor Relations Act," while the claim against the employer is for "breach of the collective bargaining agreement." DelCostello, 462 U.S. at 164.

Though distinct, "... the two claims are inextricably interdependent. 'To prevail against either the company or the Union, ... [the plaintiff] must not only show that [his] discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union.'" United Parcel Service, Inc. v. Mitchell, 451 U.S. 56, 66-67 (1981), quoting Auto Workers v. Hoosier Corp., 383 U.S. 696, 702 (1966). The Third Circuit has, thus, recognized that "A union's breach of the duty of fair representation is a 'necessary condition precedent' to a Section 301 claim against an employer for breach of a collective bargaining agreement." Roe v. Diamond, 519 Fed.Appx. 752, 757 (3d Cir 2013), citing Albright v. Virtue, 273 F.3d 564, 576 (3d Cir.2001).

**B.    The Unions' Duty of Fair Representation**

Because a union is authorized to act as the exclusive bargaining agent for its members, it has a "duty to provide fair representation in the negotiation, administration, and enforcement of the collective bargaining agreement." Findley v. Jones Motor Freight, 639 F.2d 953, 957 (3d Cir.1981). In this regard, a union is accorded a "wide range of reasonableness" in handling grievances. Hines v. Anchor Motor Freight, 424 U.S. 554, 563–64 (1976). "Proof that the union may have acted negligently or exercised poor judgment is not enough to support a claim for unfair representation." Bazarte v. United Transp. Union, 429 F.2d 868, 872 (3d Cir.1970). Moreover, "[t]he mere refusal of a union to take a complaint to arbitration does not establish a breach of duty, even if the member's claim was meritorious." Findley, 639 F.2d at 958, citing Vaca v. Sipes, 386 U.S. 171, 192-93 (1967). A union breaches its duty of fair representation only if its conduct towards a member is "arbitrary, discriminatory, or in bad faith." Vaca, 386 U.S. at 190.

### 1. Arbitrary Conduct

Union conduct is arbitrary only if it is "so far outside a wide range of reasonableness as to be irrational." Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67 (1991) (citation omitted). While a union must act fairly under a CBA, it "may not assert or press grievances which it believes in good faith do not warrant such action." George v. Northwest Airlines, Inc., 351 F.Supp.2d 310, 316 (E.D.Pa.2005). Moreover, a union has "broad discretion in its decision whether and how to pursue an employee's grievance against an employer," Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry, 494 U.S. 558, 567–68 (1990), and may "settle or even abandon a grievance, so long as it does not act arbitrarily," Bazarte, 429 F.2d at 872. In this case, the Union Defendants have summarized Kemick's deposition testimony detailing his reasons for deciding to withdraw Plaintiff's grievance, rather than proceed to arbitration, as follows:

> Kemick reviewed the text messages between [Plaintiff] and Sanders, and he believed that the text messages seemed to indicate an intent to be deceptive. He thought that they indicated [Plaintiff] and Sanders trying to coordinate their stories and that they understood what they did was wrong. He thought it was suspicious that [Plaintiff] texted to attempt to determine whether others would be present when he picked up the barrels. He saw the text messages as incriminating attempts to get their stories straight ahead of the Company's investigation.
>
> Kemick also concluded that it made no sense for the EDM scrap to be handled in the way that [Plaintiff] had claimed. He thought it made no sense for [Plaintiff] to sell the scrap under the name of his personal business, rather than his employer from which the scrap had been taken. He thought it did not make sense for [Plaintiff] to come in on his own time to haul barrels away. He thought it did not seem right that [Plaintiff] came in while he was on medical leave to collect the scrap. He noted that the Company had plenty of people available to take the scrap. He thought it did not make sense for [Plaintiff] to take the scrap all the way to Meadville when there was another scrapyard much closer to the facility.
>
> He also noted that there was no evidence that Sanders actually bought anything with the money [Plaintiff] had supposedly given him....

(ECF No. 80, at ¶¶ 112-113, 116).[4]

In response, Plaintiff raises essentially two arguments aimed at showing that Kemick's investigation was deficient and, thus, his decision to withdraw Plaintiff's grievance was arbitrary. First, Plaintiff points out that the Unions "arbitrarily decided not to call [Robinson] as a witness," and Kemick "did not make an effort to speak with Robinson to learn what his testimony might have been." (ECF No. 94, at p. 7). In particular, Plaintiff stresses that Robinson offered witness accounts regarding the EDM wire scrap recycling process at Plaintiff's unemployment compensation hearing and in conjunction with the police investigation of the Company's criminal complaint against Plaintiff, and that, in both instances, Plaintiff was exonerated of willful misconduct (ECF No. 94, at p. 7). However, neither the unemployment hearing, nor the police investigation, were completed at the time Kemick made his decision to withdraw the grievance. Thus, Kemick would have been unaware of the purported effects of Robinson's testimony.[5] Moreover, Plaintiff acknowledges that he "made the Unions aware of Robinson and the type of testimony he could provide" (Id.), thus undercutting his argument that Robinson's potential testimony was unknown and arbitrarily disregarded by Kemick and the Unions.

Second, Plaintiff asserts that Kemick's reliance on his own interpretation of the text messages exchanged between Plaintiff and Sanders, without obtaining Plaintiff's explanation of

---

[4] The Court recognizes that Plaintiff denied the referenced statements of fact at paragraphs 112-113 of ECF No. 80; however, his denial goes to the veracity of Kemick's testimony, not the content of the testimony itself. (See ECF No. 93, at ¶¶112-113, 116). In other words, Plaintiff does not dispute the Defendant Union's summary of Kemick's testimony; rather, he disputes the bases for Kemick's opinions, which is legal argument, not factual dispute. Thus, the noted summary of Kemick's testimony is undisputed to the extent it accurately reflects the testimony itself.

[5] Somewhat ironically, when Kemick proposed to delay the decision to arbitrate Plaintiff's grievance until the results of the police investigation were received, Plaintiff's attorney wrote a letter to Kemick asking him not to do so. (ECF No. 80, at p. 122).

their content, evidences Kemick's "underlying confirmatory bias" against Plaintiff.[6] In particular, Plaintiff argues that "[t]here is no evidence that Kemick gave a good faith consideration to the possibility that [Plaintiff's] actions in producing the documents were a sign of [Plaintiff's] innocence." (ECF No. 94, at p. 12). To the extent Plaintiff intends to show arbitrary conduct sufficient to establish a breach of the Unions' duty of fair representation, this argument falls short of demonstrating that the Unions' decision to withdraw Plaintiff's grievance was "so far outside a wide range of reasonableness as to be irrational." O'Neill, 499 U.S. at 67.

### 2. Discrimination

A union acts in a discriminatory manner when it is found to have treated a member unfairly "because of an 'irrelevant and invidious' distinction." Peterson v. Lehigh Valley Dist. Council v. United Brotherhood of Carpenters & Joiners, 676 F.2d 81, 87 (3d Cir. 1982), quoting Steele v. Louisville & Nashville R.R., 323 U.S. 192, 203 (1944). Here, Plaintiff cannot show that either of the Defendant Unions acted in a discriminatory manner in refusing to arbitrate his grievance, because the only other Company employees who were terminated for similar charges of theft also were denied the opportunity to have their grievances arbitrated, and Kemick, himself, had never appealed to arbitration the termination of any Company employee.

### 3. Bad Faith

---

[6] In making this argument, Plaintiff cites to a portion of his affidavit that he submitted as an exhibit to his response to Union Material Facts [ECF No. 95-5]. The Defendant Unions' have filed a joint motion to strike Plaintiff's sham affidavit [ECF No. 102], arguing that certain allegations contained in the affidavit, including the allegation that Kemick failed to obtain Plaintiff's explanation of the text messages, contradict Plaintiff's prior deposition testimony. Plaintiff has filed a response to this motion [ECF No. 109], asserting that the affidavit was intended to "fill the gap" in Plaintiff's allegations regarding the Unions' and Kemick's representation, as to which Defendant Unions' counsel failed to inquire in sufficient detail during Plaintiff's deposition. Upon review of both the affidavit and Plaintiff's deposition transcript, the Court agrees with Plaintiff. The facts to which Plaintiff attests in his affidavit were not sufficiently addressed during Plaintiff's deposition and are, therefore, not contradictory. Defendant Unions' motion to strike Plaintiff's sham affidavit will be denied.

"A breach of the duty of fair representation claim based on bad faith requires both an improper motive for the union activity, and "substantial evidence of fraud, deceitful action or dishonest conduct." Bakos v. American Airlines, Inc., 266 F.Supp.3d 729, 744 (E.D.Pa. 2017), quoting Amalgamated Ass'n of Street, Electric Railway and Motor Coach Emp. of America v. Lockridge, 403 U.S. 274, 299 (1971).

Here, Plaintiff argues that the Local Union's members, particularly King, had animosity toward him that adversely affected Kemick's investigation and processing of Plaintiff's grievance. In particular, Plaintiff notes that King served as "point person" for Kemick by acting as a "conduit" for obtaining information from the Company, despite Kemick's knowledge that Plaintiff and King were not friendly. As a result, Plaintiff claims that "Kemick's first impression of [Plaintiff] was that he was someone the union didn't like and of whom he should be cautious." (ECF No. 94, at p. 22). In addition, Plaintiff indicates that, as recording secretary, King took notes on the Union's behalf during its meetings with the Company and passed those notes onto Kemick. (Id.). Consequently, Plaintiff asserts that Kemick's evaluation of his grievance was "the fruit from the tainted tree of biased evidence." (Id.).

While, at most, the foregoing allegations may be sufficient to establish improper motive, Plaintiff has failed to produce "substantial evidence of fraud, deceitful action or dishonest conduct," Bakos, 266 F.Supp.3d at 744, to establish the existence of a genuine issue of material fact as to his allegations of bad faith.

Initially, Plaintiff argues that the Unions' representation of him "fell well below the standards" of the International Union's arbitration manual, which Kemick admitted that he had never reviewed or implemented (Id. at pp. 14-15). Plaintiff contends that the manual "is significant to this case, because it explains what the unions should have done for Plaintiff and

13

why" (Id. at p. 14). However, Plaintiff glosses over the fact that the manual, itself, states that its recommendations "are an attempt to establish best practices *far in excess* of the duty of fair representation owed to bargaining unit employees," and that "[d]epartures from our recommendations in no way violate that duty" (ECF No. 95-5, at p. 16) (emphasis in original). Thus, the Unions' alleged failure to comply with the manual does little, if anything, to establish bad faith.

Second, Plaintiff contends that the Unions' investigation of his grievance was perfunctory, because they failed to submit any written document requests to the Company, failed to interview the witnesses identified by Plaintiff, and failed to effectively advocate for Plaintiff at their meetings with the Company. In particular, Plaintiff stresses Kemick's lack of knowledge and preparation. However, "[s]omething more than claims of the absence of forensic skill, or a lackluster performance, are required to create a material issue of fact concerning unfair representation.... The union representative is not a lawyer and he cannot be expected to function as one.'" Early, 699 F.2d at 556-57, quoting Freeman v. O'Neal Steel, Inc., 609 F.2d 1123, 1127 (5th Cir. 1980), cert. denied, 449 U.S. 833 (1980). Although Plaintiff argues that the Unions' allegedly perfunctory performance was intentionally done in bad faith because of the animosity of King and unnamed "others" toward him, this argument is supported by appearances and supposition, rather than hard evidence. There is simply a lack of "substantial evidence" in the record upon which a factfinder could find that the Unions' decision was guided by "fraud, deceitful action, or dishonest conduct."

Based on the foregoing, the Court finds that Plaintiff has failed to establish a genuine issue of material fact as to his breach of duty of fair representation claim against the Defendant Unions, and summary judgment will be entered in favor of the Unions, accordingly. Because

such claim is a necessary condition precedent to Plaintiff's claim against the Company for breach of the CBA under Section 301 of the LMRA, judgment will also be entered for Defendant Ameridrives on Plaintiff's Section 301 claim.

An appropriate Order will follow.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STEVEN STARCHER,  )
      Plaintiff )  C.A. No. 16-314 Erie
    )
v. )
)  District Judge Susan Paradise Baxter
AMERIDRIVES INTERNATIONAL, )
et al., )
      Defendants. )

## ORDER

AND NOW, this 27th day of September, 2019,

For the reasons set forth in this Court's Memorandum Opinion issued this date, IT IS HEREBY ORDERED as follows:

1. Defendant Local 3199 Motion for Summary Judgment [ECF No. 76] is GRANTED, and judgment is hereby entered in favor of Defendant Local 3199 and against Plaintiff on Count I of the Amended Complaint;

2. Defendant International Union's Motion for Summary Judgment [ECF No. 77] is GRANTED, and judgment is hereby entered in favor of Defendant International Union and against Plaintiff on Count I of the Amended Complaint; and

3. Defendant Ameridrives Motion for Partial Summary Judgment [ECF No. 81] is GRANTED, and judgment is hereby entered in favor of Defendant Ameridrives and against Plaintiff on Count II of the Amended Complaint.

IT IS FURTHER ORDERED that Defendant Union's Joint Motion to Strike Plaintiff's Sham Affidavit [ECF No. 102] is DENIED.

The Clerk is directed to terminate Defendants Local 3199 and International Union from this case.

*Susan Paradise Baxter*
SUSAN PARADISE BAXTER
United States District Judge